Andrew Kratenstein, of McDermott, Woolenshelty, on behalf of the Plan Administrator, Michael Wise. And may it please the Court. Your Honors, the District Court erred in dismissing the complaint on the grounds that the Plan Administrator failed to allege knowledge, reliance, and causation. In my limited time, I'd like to focus on the money transmitter license violations and misrepresentations, unless, of course, you have questions about the other claims and legal theories. MCB engaged in two liability-creating acts with respect to the money transmitter licenses. First, we contend that MCB knowingly participated in those violations, and second, we contend that MCB aided in abetting Voyager's MPL-related misrepresentations. Turning first to MCB's knowing participation in the violations themselves, State consumer protection laws generally prohibit unfair, deceptive acts or practices, unconscionable conduct, or unlawful practices in the course of a defendant's business. Doing business without a required money transmitter license is an unfair and unconscionable act that triggers liability under those laws. We contend that MCB is liable as a knowing participant in, in fact, architect of, the scheme to avoid those MTL requirements. No, I think we know all that. Yes. So I'd like to sort of hit the ball points. What are the two or three best pieces of evidence that reflect the knowledge of MCB with respect to these incidents? Of course, Your Honor. The complaint pleads the following facts. First, MCB knew operating without money transmitter licenses was illegal. In fact, it's a felony. Second, MCB sought an estimate in ETA, that's a quote, on Voyager receiving all 50 money transmitter licenses. The answer that it received was that Voyager only had a handful of those licenses, eight to be specific. MCB told Voyager specifically, and this is a quote, you aren't supposed to move or control any of the money without those licenses. That's from CA 32, paragraphs 199 to 200. MCB then drafted and encouraged Voyager to sign the, for the benefit of account agreement, the FBOA. MCB then told Voyager that once the FBOA was executed, Voyager, and this is a quote again, utilize MCB's bank exemption to transmit fiat without an MTL license. That's CA 30, paragraph 187. MCB acknowledged that MCB's MTL exemption for fiat may not cover crypto, but said in substance, you're better off with it than without it. Importantly, your honors, the FBOA made it look like MCB, not Voyager, was the money transmitter. Specifically, section 2.1 of the FBOA states that the bank, that is MCB, hereby appoints Voyager as the bank's representative to market, offer, and sell cryptocurrency. Well, that's the whole other issue in the case as to whether they actually had this program where Voyager was acting to market current crypto on behalf of the bank, right? That's the agency argument. But the questions about the licenses, it's up front at the beginning of their relationship when they asked, do you have all the licenses, and they say no, right, and then Voyager says we're going to get the licenses. I mean, is there really evidence that there's some kind of ongoing monitoring by MCB over whether they've pursued all of those licenses? Yes, because we know that in February 2020, Voyager told MCB that certain states required MTLs regardless of the FBOA and even for fiat. That's at CA 32 to 33, paragraphs 201 to 04 of the complaint. MCB, we also allege, then helped craft the response to those regulators. That's at CA 33, paragraph 204, and then following the regulator's rejection of the FBOA, using the FBOA to get around the MTLs, MCB agreed to amend Voyager's customer agreement and to retitle the FBO account within MCB to be an MCB-owned account instead of a Voyager's account. We contend to reinforce the fiction. Well, you contend that, but do we know that that's the reason why? I mean, it is an MCB account, right? Well, no. It was originally a Voyager-owned account. They tried to make it an MCB account. We contend to try to make it look like MCB had privity with the customers. I mean, you keep saying we contend, but like, since this is about showing actual knowledge, what allows for the inference that the reason of the titling of the account is specifically because they want to avoid MTL requirements? Well, so, and maybe I should be more precise. We pled that, thus we contended, but we're entitled to fair, reasonable inferences in a complaint. We think it's just as reasonable an inference under TELABS that the purpose of these changes was to help skirt the MTL requirements. Otherwise, why are they doing them? I mean, they've been told by regulators, you're not supposed to be doing this. In fact, certain regulators eventually shut them down. We know that that happened, for example, in Alabama. So they're clearly trying to get around the requirements. They're telling them in substance, use this agreement. This agreement can help you get around the requirements. And the regulators are pushing back and saying that. Before the regulators had rejected it, right? I mean, there isn't a statement that says, nevertheless, you should continue to rely on the bank. But they didn't. But at that point, Your Honor, when they know that the regulators are saying you aren't supposed to be controlling and moving money, which cryptocurrency is, without these MTLs, MCB still allows them to use the FBO account. I mean, let's remember what the FBO account is. The FBO account is critical because it's the account into which all of the customers deposit their cash. It gets turned into cryptocurrency. They can then exchange it back into cash and make a withdrawal. Without that account, this, what we allege is a scheme, doesn't work. This is the lifeblood of it, the bedrock. As Voyager itself said, they needed this. But if it were the case that, you know, as the other side contends, the MCB was providing a bank account and wasn't monitoring all of Voyager's ongoing operations and all of its representations, then it wouldn't be evidence that they're implicated in some kind of MTL scheme just if they let them continue to use an account as a vendor, right? Well, it's one, I understand your point, Your Honor, where it's one thing to sort of be unaware that an account is being used for an illicit purpose. But I think the law is pretty clear that once a bank becomes aware that an account is being used for an illicit purpose, if they don't do something about that, they then become complicit in the... You're saying they must have been aware because they knew that Voyager was trying to get the MTLs. This theory about using the bank account instead was rejected by at least some regulators. Correct. And they never heard that they got the actual licenses otherwise. They knew from the outset that they didn't have the licenses. I mean, we do allege that from the beginning this was problematic. From the outset they knew they didn't have the licenses but that they were making efforts to get them. Right. So it has to be that they also know that they didn't, those efforts weren't successful or weren't being pursued. And we allege that, I'm sorry to interrupt, Your Honor, and we allege that that in fact happened with several regulators. And we allege it happened with Alaska, it happened with South Dakota. I already just talked about Alabama. So it happened and they allowed the accounts to remain open. And they also continued, I mean, this is also relevant. I mean, the fact that you have a bank lending its good name to this account gives people a feeling of security. And this is a fundamental, the fact that you have the licenses. I mean, when all of us in this room put ourselves out to the public saying we are attorneys, right, you can come to us for your legal needs. We're telling the public we're licensed, right, implicitly or explicitly. And that's what Voyager was doing. And they didn't have the licenses. And MCB, we allege, took various steps to help them try to skirt those requirements knowingly. I see my time is up. So I will, I guess I'll move to, wait for my two minutes of rebuttal. All right. Thank you, Mr. Kratenstein. We'll now hear from Mr. Crossman. Is that right? Mr. Crossman. Crossmani. Crossman is correct, Your Honor. Oh, okay. Sorry. Before you start, I just want to acknowledge we have some visitors from Harvey Milk High School in East Village. So thank you for being here. We're always delighted to have students visit our courthouse. Sometimes it's a little tricky to follow an argument if you haven't read the briefs. Have you read the briefs? Well, we'll excuse that. Anyway, thank you for coming here. This is part of a civics education program that we're very proud of and that Judge Bianco leads. So I hope you have an enjoyable day here at the courthouse. All right. Mr. Crossman, the floor is yours. Thank you for telling me that, Your Honor. If any of the students hear anything interesting they want clarification on, tell them to poke me on the way out, and I'll talk to them in the hall. I'll be careful what you ask, yeah. So thank you, Your Honor. My name is John Crossman of Zuckerman Gore Brandeis and Crossman. And may it please the Court. I don't want to repeat anything we put in that brief, which speaks for itself, but there are nine things that I want to tell Your Honors. Nine? Nine things. You better get moving. You've got nine minutes. They're short, mostly. But they're all things that we feel that Mr. Weiss could be misconstrued if I don't explain what's really going on from the reply brief. So everything I'm going to talk to you about for your questions is about the reply brief. First of all, as you know, Judge Engelmeyer found that the only program that was implemented by the FBO agreement was an FBO account. And he found that not surprising, since that's the name of it. In reply, Mr. Weiss says that this determination by Judge Engelmeyer left Section 2.1 of the agreement with no meaning. And he claims that we have no response to their position that there's no meaning in 2.1 if it means what it says. And I just want to point out that all you have to do to refute that statement of no meaning is read Section 2.1, which is only one sentence long. It's 44 words. And the reason you need to read it is because when Weiss quotes it, he only quotes the first 20 of those 44 words. And then he stops. And it could be confusing, because in their complaint in paragraph 67, when they quote it, they don't include an ellipsis or a square bracket or anything to alert the Court that it's not the full sentence. And I wouldn't want you to go off thinking those are all the words, because this is an important sentence. And we know that that omission of the ellipsis couldn't have been a one-off mistake on a sight check, because they do the exact same thing also in paragraph 68 of their complaint. And then they do it a third time in paragraph 82 of their complaint, each time quoting only the first 20 words. And they leave off the part, and I'll read the part they leave off, which says, as agreed in writing by the parties from time to time that meet the bank requirements solely in accordance with the terms of this agreement. All of that — Your position is that that part of the agreement is basically kind of a framework agreement, that, you know, this will be a framework, and in the future we can launch additional programs under that framework. That is an excellent way to describe it, Your Honor. I love the term framework agreement. Yes, it was intended — and it's — that intent is carried through in the very next section of the agreement, 3.1, which they don't cite at all. And then your position is that you might have decided to do that, but you did not, in fact, launch any other programs from time to time. That is correct. And it's not hard to see why, because if we all cast our minds back to the years 2019 and around that time, crypto was new. The whole idea of having crypto businesses was new. This was an emerging industry. Obviously, anyone getting involved in it had to be thinking ahead, thinking, well, how are we going to do this? And so here we have in the agreement, we will from time to time put something in place. It's a framework, as Your Honor said. Now, I searched the complaint, which has 871 paragraphs, for the phrase from time to time, just because I was curious if they acknowledged this forward-looking framework approach anywhere in the complaint. And strangely, they don't say the words from time to time, literally in 871 paragraphs of allegations. So — But there is a point that the agreement does envision at least the possibility that Voyager is going to be acting as an agent for MCB, right? There is a possibility, absolutely. We would not disagree with that. We'd have to look at the other writing that established that program. If there was one, yes. It says it has to be in writing. But this agreement does describe the provision of the FBO account as itself a program, right? So should we understand the provision of the FBO account in light of this Section 2.1 to say, you know, insofar as that's a program, Voyager was kind of acting as the agent of MCB? Your Honor, excuse me. The word agent and the word used in the agreement is representative. I'm not trying to be picky here, but there might be some difference in some circumstances to what exactly a — Well, I know. But the thrust of the argument you just made is that Section 2.1 doesn't apply because we never launched a program. But, like, you did launch at least one program, which is the FBO account, and so — Other than — My argument, to be perfectly clear, Your Honor, is it doesn't apply except to the FBO account maintenance, which is what Judge Inglemeyer said and which we agree with. It's that one program, the FBO account, is the only thing that's agreed among the   So then what's the interaction between Section 2.1 and the FBO account? If Section 2.1 says Voyager is going to be the representative of MCB in the programs and the FBO account is a program, does that mean Voyager is using the FBO account as a representative of MCB? There is some element of that, I think, there. Certainly, the court below felt there was some connection of Voyager, because there is an interaction, right? The customers who are putting their money in the FBO account, the people for whom it's for their benefit, those are customers of Voyager who Voyager has said, put your money in this account, that we've set this account up with MCB to hold your dollars, and that's what you do with an FBO account. So All right. Well, then the way you've just described it is that Voyager is basically the interface between MCB and the public urging them to deposit their money in the MCB account. So why isn't that a kind of an agency relationship? It can be. But that's what Judge Englemeyer was saying. I'm saying, here, Your Honor and I have just exposed a clear, logical meaning for this entire agreement and Section 2.1. I'm refuting the statement that Judge Englemeyer's reading of the contract, which contemplates the FBO account being No, I get that argument. But if, in fact, what you just said is right, which is that Voyager is kind of the representative of the bank and urging customers to deposit funds into the FBO account, then aren't you basically saying they are kind of acting where the bank is the principal and Voyager is the  And all these misrepresentations that we're talking about are representations that are urging customers to make these deposits. The only thing that Voyager did with respect to this FBO account for MCB is tell them, if you want to use U.S. dollars, this is the account you put them in. And if Voyager were to tell those customers, your U.S. dollars in that FBO account are FDIC insured, for example, that would be an accurate, correct statement, which they would be fully entitled to make, because it is an FBO account at my client's bank. And therefore, if my client's bank were to go belly up, the FDIC would protect those deposits. And of course, there's no dispute in this case that every single U.S. dollar that was deposited into that FBO account was available to and repaid to the customers who are now the assigners. No one lost a nickel from the FBO account. You have eight other arguments that we're going to get to? Yes, if I have time. I mean, this is important, so I'm happy to spend time on it. You're like Tom Brady, so go ahead. Maybe we don't need to get to all eight because we have your briefs. I'm more interested in hearing your response to what Mr. Kratenstein said in his argument, which is the bank knew that Voyager didn't have the licenses. It suggested maybe you could piggyback on our permission to make transfers based on the account. Then the bank also knew that regulators had rejected that, and it didn't see that Voyager had obtained the licenses, so why doesn't that implicate them in some kind of a scheme to operate without the licenses? The bank was aware that they were in the process of figuring this system out. Not even all the states yet knew whether you needed an MTL license in those particular states. This was all being developed. It was all being analyzed by the 50 states while this stuff was going on. It was all new. So we knew that there were 17 states that had MTL licenses for Voyager, and Mr. Weiss alleges that himself. So we know that they had them, and we knew that Voyager was in the process of trying to get the others. At no time did MCB ever take on responsibility to either counsel Voyager or direct Voyager or be Voyager's lawyer or their regulatory counsel. None of those things. All we did was provide a bank account, and Voyager was in the process of figuring these things out. The actual quote— All you do is provide a bank account, but you just described the way the bank account is set up is that Voyager is kind of the intermediary between the public and the bank, and also the FBO agreement gives the bank all of these rights to, like, understand the regulatory requirements and compliance by Voyager. So why shouldn't we understand that to be that the bank had some interest in making sure that all these operations were licensed? Well, I see my time is about to expire, but if I can answer your question, if I may be allowed. The—I stopped myself by seeing the red light. The bank was providing the account. The users, the Voyager, was either finding or not finding. It was true that as a bank, as a highly regulated bank, the bank must always retain some level of regulatory compliance ability. But there's no allegation that they ever actually exercised any of that ability anywhere, and Judge Engelmeyer specifically found that there was no such allegation on that point correctly. And so there was no way for the bank to do that, and—and this is important, that I think you need to— But there's a way for it to do it. You just said that they had the rights. You're just saying that they didn't do it. That's right. That's right. There was no—there was no point at which to do that. Everything was evolving. And I want Your Honors to recognize that the importance of this is totally questionable to begin with, because we had 17 at least States with these MTL licenses that had been given to Voyager. And the—Weiss doesn't dispute that those licenses were in place, and he doesn't— The bank could have, you know, known that you had at least some licenses and you weren't making sure that, like, every—you know, you weren't monitoring what Voyager was doing in every single State, and you wouldn't know that everything—that some of what they're doing is unlicensed because at least some of it was licensed. Is that—is that the point? Well, it wasn't our job to pierce and parse exactly what they were doing. One other thing that Mr. Kratenstein brought up was the retitling of the account. Yes. He says that that must be to circumvent the MTL requirements. What is— How could that possibly be to circumvent anything? Are we really thinking that any regulator who—if Voyager was going to say to a regulator in, I don't know, North Dakota, hey, we're using this FBO account instead of an MTL license, and they want to get that regulator to say, fine, go ahead, do we really think that regulator wouldn't read the FBO— Oh, so you're saying it's not plausible that it was a circumvention of the MTL requirements. What was the point of it? Well, as—as is quoted in the complaint, somebody from the banks said, you know, we don't know what every State's going to do, but you're better off with it than without it, meaning some States may say, hey, as long as you're dealing with a bank, which, of course, is exempt from money transfer regulations, banks don't have to comply with this stuff, as long as you're dealing with a bank, we're good with that, at least for U.S. dollars. That might be a position that some— You're saying that it was related to the MTL requirements, then? I'm saying that it is possible that a State would not require an MTL license if the money was going into and out of an account at a bank. It is possible. But these were decisions that individual States were making, and we were not privy to that. We were not involved with it. All we did was provide the account, and then what use could be made of that account was entirely up to the—up to Voyager. They're the ones who are interfacing with these 50 States. We weren't doing it. And yet they claim it made some difference here, but realize their complaint for all 31,867 plaintiffs—or signers, I should say—for all of them, they say the damages are the same. They allege them in a group. And yet at least 17 States have the MTL licenses that they say would have ameliorated these people's damages. And so when it suits them, it's a big deal. But when it comes time to talk about damages, it doesn't make any difference. And that's an—that was one of my nine points. I want to at least get that one in if I could. But these were your responses to the reply, so they're not in your brief, technically, right? These other—the other seven that we haven't heard. Judge Menasche has asked me a number of things, and so I'm sure I've said some things that are in my brief. I don't want to say that they're not in my brief. Okay. All right. Well, thank you, Mr. Kratenstein. I'm happy to go over the other seven things if Your Honor wants, if you're interested. We have a full calendar. All right. Well, I thank you for your time, Your Honors. Thank you. All right. Mr. Kratenstein, now you have two minutes for rebuttal, so the floor is yours. Thank you. Let me just respond as quickly as I can to a few points that were made. In terms of the knowledge point and the point that everybody was just figuring this out, maybe that's true for crypto. It's not true for fiat cash. That is, everybody knew that you needed money transmitter licenses for fiat. It was crypto that was up in the air. That's why we allege, MCB said to Voyager, you know, you can try to use the FBO account to get around for fiat. Crypto, a little less clear. So that was the situation at the time. But they didn't have them even for fiat, and that was part of the regulatory pushback. You need this regardless of crypto or fiat. In terms of the point made about why isn't MCB acting basically responsibly by saying you do need the licenses for fiat. Maybe it helps that you have this bank account. But, you know, they never say don't bother getting the licenses. No, that's true. They never said don't bother getting the licenses. But I think a fair implication from the communications is you can use the FBOA to try to get around those requirements. They may approve the FBO and the FBOA without giving you an MTL. You may not need an MTL for that. Counsel, you can try to get around, but is that what you allege, that this was a conspiracy to avoid it, or was it merely to try to figure out whether they could comply with the requirements if an FBO would satisfy it as your opponents? No, our allegation, thank you, Your Honor. Our allegation is that it was, and that there's a fair inference that there was a conspiracy to avoid it, to try to circumvent the regulations by using the FBOA. You now use the word conspiracy. Does your complaint lay out where it was that they reached this agreement with regard to an attempt to avoid the MTL, and what paragraph specifically are you referring to? Yes, Your Honor. Let me go back to the knowledge allegations that I referred to earlier. So. And just give me the paragraph. Yes, of course. Paragraphs. I'll give you the paragraphs of the complaint, if that's all right, Your Honor. Yeah. Okay. Paragraphs, well, I'm going to go through sort of the whole story. There's paragraphs 169 to 72 and 181. Then we have the part about, that's asking about do you have the licenses. Then to the part about you're not supposed to move or control any money, that's in paragraphs 199 and 200. Then the drafting and encouraging of the signing of the FBOA, that's in paragraphs 181 to 183. The statement that you could utilize, and that's a quote, the bank exemption to transmit fiat without an MTL license, that's in paragraph 187. The acknowledgment about the exemption perhaps not applying to crypto, that's in paragraphs 187 through 190. Then we turn back, and this was also a part of the questioning about the FBOA itself in section 2.1, and I did want to address that briefly, and that's in paragraphs 66 to 68. And I actually think this is relevant to your question as well, Judge Wesley, and it goes back to the questions Judge Manasci asked too. Section 2.1, like, just let's look at the plain language. Let's forget about ellipses and forget. It says that the bank, that's MCB, hereby appoints the client, that's Voyager, as bank's representative to market, offer, and sell cryptocurrency exchange services and other related products as agreed in writing by the parties from time to time that meet bank requirements solely in accordance with the terms of this agreement. That's under a section that says purpose, and under an article title, it says general description of the program. So why is that section in there? We contend that it's in there because they were trying to create a relationship that made it look like the customers were closer, and that MCB, this was basically an MCB account that you can get around all the money transmitter licenses because you're affiliated with a bank. And then when that didn't work, they retitled it to make it an MCB-owned account instead of a Voyager account. And we contend, going back to one of Judge Menasche's questions, that that was a fair inference. And, of course, discovery will... But they wanted to say that if they wanted to say we're setting up Voyager as an agent, they would have just said that. Why would they say the bank is only, or sorry, the client is only the representative as agreed in writing by the parties from time to time? Well... And, you know, the next section, 3.1, says the scope of this agreement shall be limited to the bank's formally accepted and approved programs. So, like, it is saying, actually, yeah, we're setting up this framework, but it's only going to apply if you can point to a specific program that we formally adopted. And what I would say is that the program that they formally adopted, what they've done is they've set up this FBO account, which the purpose of that is that's where the money's coming in to be exchanged into crypto. So if you just look at the plain language, they're being appointed, Voyager's being appointed as the bank's representative to market, offer, and sell cryptocurrency exchange services. If you just take that on its face, its plain language, that's the program, that's what the FBO account is designed to serve. I was actually suggesting that to opposing counsel that maybe we should read the two things together. But just in terms of, like, what the parties actually did, I mean, if, in fact, Voyager was acting as the representative and not simply a client who uses a bank account, wouldn't you expect the bank to be a lot more pervasively involved in the operations of Voyager? Well, we do have, we do cite evidence of them being involved. Maybe not as pervasive as you might think, but they did get marketing materials, which they approved. They asked lots of questions about how it was being used. They did suggest to them, here's how you could respond to the regulators. So to suggest that this is a sort of hands off, you know, it's just a bank account, like a checking account, and we're not really going to monitor what's going on there isn't consistent with the record. But you need to establish actual knowledge, right? And so, I mean, what you've got is a couple of straight lines here and there, and you're asking us to sort of draw these inferences. But there's no witness who's saying that any sort of relationship like this existed, right? That knowledge of the lack of licenses or knowledge of what you're alleging is a pretty serious scheme. Well, but we do have the evidence, Your Honor, that they knew full well, because Voyager told them that the regulators had not agreed that the FBOA allowed them to not get money transmitted licenses. They specifically knew that. And you're right, Your Honor, do we have a smoking gun that says, yes, you know, let's have a scheme to defraud? I mean, that's, as the case is all recognized, that's rarely in writing. We think that when you put together all the facts, one after the other, and all the reasonable inferences to be drawn as required on a, and remember, we're at the complaint phase here, not summary judgment, that we're at least entitled to a reasonable inference so that we get into discovery to get more of the facts. That's the crux of our argument. All right. Well, thank you both. We will reserve decision.